Michael RIVERA, Peter Nevarez, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Douglas X. PATINO, individually and in his capacity as Director of California Employment Department, and F. Ray Marshall, individually and in his capacity as Commissioner of the IRS, Defendants.

No. C–80–3469 RFP.

United States District Court, N. D. California.

July 9, 1981.

As Amended July 15, 1981.

Robert E. Taren, James Rumble, Senior Citizens' Legal Services, Santa Cruz, Cal., for plaintiffs.

Mark C. Rutzick, Peter W. Waldmeir, Attys., Dept. of Justice, Washington, D. C., for federal defendant.

Asher Rubin, Deputy Atty. Gen. for State of Cal., San Francisco, Cal., for state defendant.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

This case involves the statutory reduction of unemployment benefits by recently-enacted pension offset provisions. The newly-enacted state and federal provisions require that certain pensions be offset dollar-for-dollar against unemployment insurance benefits for which the pensioner would otherwise be eligible. Thus, a worker who accrued a pension at one job, retired, found

that the pension was not sufficient to meet his needs, found another job, and then was laid off from that second job, might be denied all or part of the unemployment insurance benefits which he would otherwise have accrued at that second job.

As discussed in this memorandum, the state defendants' motion to dismiss plaintiffs' constitutional claims and the federal defendants' motion for summary judgment with respect to those claims is granted. Further, we award summary judgment in plaintiffs' favor and against defendants as to the validity of UIPL 7–81 because that directive is void as a result of the Secretary's failure to publish it in the Federal Register and afford interested parties an opportunity to comment. As is also discussed below, we grant plaintiffs' motion for class certification, and hold that notice to the absent class members prior to resolution of the questions decided herein is unnecessary. Finally, we stay further proceedings in this action until after the Secretary promulgates implementing regulations pursuant to the procedures specified in this order.

## I. FACTS

Plaintiff Rivera sues on behalf of himself and others similarly situated. He is a 72-year-old retired auto worker. Finding that his $380.00 a month Social Security pension, plus his $110.00 a month auto industry pension, were not enough to meet his expenses, he took a part-time job as a mechanic, earning about $100.00 a week. Eventually, he was laid-off from this job, and applied for unemployment insurance benefits which, but for his pensions, would have amounted to $54.00 a week. His second employer was considered a Social Security "base period employer" (see below), meaning that he continued to accrue Social Security pension benefits while working for this employer. By the time he was laid-off, therefore, his Social Security pension had risen to $408.00 a month. Under the new pension offset rules, the fact that his unemployment insurance base period employer was also a Social Security contributor

meant that his *entire* Social Security pension (*not* just the increase accrued while working for this employer) was to be offset against unemployment insurance benefits. His small automobile industry pension was also offset, making him ineligible for unemployment insurance benefits. He was therefore unable to meet his bills.

## II. OVERVIEW OF THE UNEMPLOYMENT INSURANCE SYSTEM AND THE PENSION OFFSET PROVISIONS WHICH ARE THE SUBJECT OF THIS ACTION

█ It is important to keep in mind that unemployment insurance is a system of "cooperative federalism," in which each state receives federal funds to reimburse its costs of administering the program, and employers receive a federal tax credit for the unemployment insurance tax they pay. To receive these federal benefits, a state's program *must* meet certain federal requirements. Federal law sets forth minimum eligibility requirements, but a state is free to impose stricter requirements. Thus, under the new statute, states must offset certain pensions against unemployment insurance benefits in order to maintain federal certification, but if Congress were to repeal the pension offset provision, the state of California could still enact and enforce an identical provision.

In this case, however, California's pension offset provision seems to have been enacted solely in response to federal coercion. It tracks the federal language and contains a "self-destruct" clause stating that the California provision shall remain in effect only as long as it is required under Federal law.

The original federal pension offset provision, enacted in 1976, required the states to offset *all* work-related pensions against unemployment insurance benefits, beginning on April 1, 1980. The California conforming language precisely tracked the federal language, and added:

The provisions of this section shall be operative only during such time as § 3304 of the Federal Unemployment Tax Act requires that state unemployment insur-

ance laws contain such provisions as a condition of certification of state unemployment insurance laws by the Secretary of Labor.

Cal.Un.Ins.C. § 1255.3(b)

On September 26, 1980, the pension offset rule (26 U.S. § 3304(a)(15)) was amended and significantly limited. The amendment provided that pensions were required to be offset only if:

(i) such pension . . . is under a plan maintained (or contributed to) by a base period employer or chargeable employer, and

(ii) in the case of such payment not made under the Social Security Act or the Railroad Retirement Act . . . services performed for such employer by the individual after the beginning of the base period (or remuneration for such services) affect eligibility for, or increase the amount of, such pension. . .

The applicable unemployment insurance "base period" varies from state to state. In all states it is some four of the last five calendar quarters before the individual applies for unemployment benefits. The "base period employer" is taxed if his employee becomes eligible for benefits. The amendments quoted above seem to have been designed to require the offset only of pensions to which a "base period employer," who would already be contributing to the employee's unemployment insurance benefits, had contributed. Stating the amendments in simpler words, it would seem that they require offset only of (1) Social Security and Railroad Retirement pensions which the base period employer had "maintained or contributed to," and (2) other pensions which the base period employer had maintained or contributed to *and which had increased (or become vested) as a result of services performed for that employer during the base period.*

In anticipation of the above federal amendment, the California legislature passed an "urgency statute" which amended the corresponding state pension offset provision. *See* A.B.No.2239 (Statutes of 1980, Ch. 1174). It provided:

(c) the reduction of benefits specified in subdivision (a) shall be limited by the provisions of any amendment to Paragraph 15 of Section 3304(a) . . . which . . . permits a limitation on the reduction of unemployment benefits by the amount of any pension. . . . This subdivision shall only apply to benefits paid after the effective date [of any such federal amendment].

Thus, both pieces of California's conforming legislation strongly indicate that the legislature imposed pension offsets on California workers only under Federal compulsion.

The California pattern of bending to Federal compulsion in the matter of pension offsets continued at the administrative level. On October 9, 1980, the Department of Labor issued a "Directive" instructing the state agencies what pensions must be offset under the Federal amendment. Thereupon the California Employment Development Department issued *its* field office directive, which tracked the federal directive. The federal directive provided, among other things, that:

1. a private pension that increases because of work during the base period must be offset *in its entirety*, not just in the amount of the increase;

2. a Social Security pension must be offset in its entirety if the base period employer paid Social Security taxes, even if the base period employer did not employ the individual during any period affecting his eligibility for or the amount of his Social Security pension;

3. private pensions must be offset even if they vested before the effective date of the statute, April 1, 1980;

4. monthly pensions must be offset (on a pro rata basis) in weeks during which no pension payment is received.

Plaintiff (and the UAW) contend that these interpretations of the statute are unwarranted and, in any case, would render it unconstitutional. They also contend that the Department of Labor Directive is null and void for failure to comply with the publication requirements of the Administrative Procedure Act and/or the Freedom of

Information Act. Plaintiffs also assert several constitutional challenges, based on (1) equal protection, in that the distinctions between pensions that are offset and those that are not have no rational basis; (2) the contract clause; and (3) deprivation of property without due process. Plaintiffs also seek class certification. Defendants move for summary judgment or dismissal, raising a number of issues involving standing and jurisdiction as well as issues concerning the merits. We will discuss the "avoidance" issues, the "merits" issues, and the motions for injunctive relief and class certification in that order.

### III. DISCUSSION

#### A. "Avoidance" Issues: Standing and Jurisdiction

##### 1. Standing

The federal defendant moves to dismiss on the theory that plaintiffs lack standing to challenge the federal statute and directive because their injury, if any, results from enforcement of the *California* statute, and there is no showing that invalidation of the parallel federal provision would redress this injury. The theory seems to be that, since the states do not have to participate in the cooperative federal-state unemployment insurance system at all, the federal government may with perfect impunity require participating states to impose illegal eligibility rules upon their residents. We do not agree.

■ The case law makes it quite clear that an intended beneficiary of a cooperative federal-state assistance program, such as unemployment insurance or Medicaid, has the right to seek judicial review of federally-imposed eligibility requirements. *See, e. g., Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Williams v. Zbaraz*, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980); *Grace Brethren Church, et al. v. State of California*, N.D. Cal. No. 79–93 (1980); *Tongol v. Usery*, 601 F.2d 1091 (9th Cir. 1979); *Martinez v. Marshall*, 573 F.2d 555 (9th Cir. 1977). Defendants' suggestion is so far from the actual rule that, in one case where the plaintiff asserted a federal statutory challenge to the state's administration of its unemployment insurance program, and failed to join the Secretary of Labor as a defendant, the Supreme Court suggested that he do so in order that complete relief might be accorded. *California Dept. of Human Resources v. Java*, 402 U.S. 121 at 135, n.19, 91 S.Ct. 1347 at 1355, n.19, 28 L.Ed.2d 666 (1971).

■ While there have been cross-currents to this rule, *see, e. g., Northern New England Conference of Seventh Day Adventists v. State of New Hampshire*, No. 80–266–L (D.N.H. July 17, 1980); *State of New Hampshire Department of Employment Security v. Marshall*, 616 F.2d 240 (1st Cir. 1980), we do not find these cases persuasive, particularly where, as here, the legislative history of the state enactments suggests quite strongly that they were enacted solely as a result of federal compulsion. In contrast to the situation in *State of New Hampshire Dept. of Employment Security v. Marshall, supra*, where the state refused to comply with FUTA, in this case the state of California acted quickly to comply with federal requirements. The case is distinguishable from *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), where the immediate providers of benefits (*i. e.*, hospitals, who had been given a tax benefit for providing care to the needy) had given no indication whether or not their behavior would be influenced in any way by the repeal of the federal statutory incentive to provide benefits to the needy. Because of the "self-destruct" features of the California legislation, it is quite clear that there is a "fairly traceable causal connection between the claimed injury and the challenged conduct." *Arlington Heights v. Metropolitan Housing Dev. Corporation*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977).

Therefore, the federal defendant's motion to dismiss for lack of standing is denied.

##### 2. The Tax Injunction Act

■ Defendants contend that, because the decision in this case might affect the

amount of state unemployment insurance taxes—that is, a judgment in plaintiffs' favor might result in increasing those taxes— the Tax Injunction Act, 28 U.S.C. § 1341, divests this court of jurisdiction to award injunctive or declaratory relief. If this were true, the federal courts could not have asserted jurisdiction in any of the vast number of reported cases which involve challenges to the denial of unemployment insurance or Medicaid benefits. The purpose of the Tax Injunction Act, however, was to prevent the federal courts from interfering with the states' ability to collect sufficient revenue. *See Rosewell v. LaSalle Nat'l Bank,* 450 U.S. 503, 524, 101 S.Ct. 1221, 1235, 67 L.Ed.2d 464 (1981). Every court considering the question whether it had jurisdiction to issue an injunction which might have the effect of *raising* state taxes has therefore determined that it did. *See, e. g., Hargrave v. McKinney,* 413 F.2d 320 (5th Cir. 1969); *Cornelius v. Benevolent Protective Order of Elks,* 382 F.Supp. 1182 (D.Conn.1974); *Grace Brethren Church v. State of California, supra. Stockton Metropolitan Ministry v. Glick,* Civ. No. S–80–807, and the other cases on which defendants rely, are all distinguishable, because in each case the plaintiff challenged a tax assessed against him and a decision in his favor would have the effect of reducing state tax revenues. Accordingly, we find that the Tax Injunction Act does not deprive this court of jurisdiction, and deny defendants' motion to dismiss.

B. *"Merits" Issues*

1. *Impairment of Contract*

Defendants argue that, as a matter of law, the disputed statutory provision cannot, as plaintiffs claim, operate to impair plaintiffs' constitutionally protected contract rights. We agree, and order that the contract claim be dismissed.

▆ The "contract clause" of the United States Constitution provides that "No State shall ... pass any ... law impairing the obligation of contracts...." U.S.Const., Art. I, section 10, Cl. 1. The clause operates against the Federal government through

the due process clause of the fifth amendment. *Lynch v. U.S.,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934).

▆ In *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), the Court set forth a three-step test to determine whether legislative action violates the contract clause. First, there must be in existence a valid contract or obligation of a contractual nature. Second, the obligation must have been "impaired." Third, the impairment must not have been reasonable or necessary. In the instant case, plaintiffs fail to clear the first hurdle.

▆ It is true that a statute may create a contractual obligation which is protected by the contract clause "when language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the state." *United States Trust Co., supra,* at 17, n.14, 97 S.Ct. at 1515, n.14. However, not every statute creating an entitlement to public benefits or creating obligations on the part of the government creates rights of a contractual nature. *See, e. g., Northwestern National Life Insurance Co. v. Tahoe Regional Planning Agency,* 632 F.2d 104 (9th Cir. 1980); *Even v. Clifford,* 287 F.Supp. 334 (D.C.Cal. 1968) (statute setting forth method of induction into active military service did not create enforceable contractual right). Some private and public employees' pension plans created or governed by statute have been held to create contract rights. *See, e. g., Wyper v. Providence Washington Insurance Co.,* 533 F.2d 57 (2d Cir. 1976); *Pineman v. Oechslin,* 494 F.Supp. 525 (D.Conn. 1980). Similarly, a public employee's reliance interest in a continued salary level as embodied in legislation has been held to be protected by the contract clause. *See, Fisk v. Police Jury of Jefferson,* 116 U.S. 131, 133–34, 6 S.Ct. 329, 330, 29 L.Ed. 587 (1885). All of these cases dealing with employee benefits have one fundamental characteristic in common which is lacking in the instant case: in each, it was crucial that the employee had given "consideration" in exchange for pension or other rights, by con-

tributing to the pension and/or by "agreeing not to quit" in exchange for continued pension or other rights. In this case, there is nothing in the nature of a voluntary, bargained-for exchange between any of the parties involved (i. e., the employees, the employers, the state government, and the federal government). Employers' contributions to the unemployment insurance fund are a tax, reflecting an exercise of the police power; there is nothing voluntary about them. *See, Martinez v. Socoma Cos., Inc.*, 11 Cal.3d 394, 401, 113 Cal.Rptr. 585, 521 P.2d 841 (1974). Similarly, it cannot be said that the expectation of unemployment insurance coverage acts—as a pension might—as an inducement to the employee to remain at a particular job. Unemployment insurance is not bargained for in any way; pension rights, on the other hand, vary significantly from one job to another. Plaintiffs and amicus vigorously argue that the statute unconstitutionally deprives workers of pension rights that have vested, and that in this respect it violates § 1053 of the Employee Retirement Income Security Act ("ERISA"), as well as the contract clause. We cannot deny that the practical effect of the statute on those in plaintiffs' position is to reduce their income. We assume that this result will seem equally unfortunate to the unemployment insurance claimant as it would if his pension and not his unemployment insurance were reduced. It is inescapable, however, that the rights and duties created by plaintiffs' pension contracts are not affected by the statute. *Compare, Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), in which the statute, by its express terms, imposed new duties upon employers with respect to their pension plans. *Alessi v. Raybestos-Manhattan, Inc.*, —— U.S. ——, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), is also distinguishable. That case involved a challenge to provisions in private pension plans which required workers' compensation benefits to be offset against pensions for which the plaintiffs would otherwise be eligible. The case suggests that a similar provision requiring the offset of unemployment insurance benefits

might be improper under ERISA's non-forfeiture provisions. *See, id.* at 1904. *Alessi*, however, did not involve a challenge to *legislative* action. Further, the challenged pension plan provisions required a direct reduction of vested pension benefits. In this case, the set-off legislation, by its terms, reduces *unemployment insurance benefits* by the amount of any pension benefits and not vice versa.

Amicus also argues with some force that pension and other employee benefits are hard won at the bargaining table, at which the employer's potential liability for unemployment insurance benefits is taken into account. The parties have therefore entered their private contracts in reliance upon the unemployment insurance benefit levels then in force. As explained above, however, the unemployment insurance system confers no contractual right to continued benefit levels. Moreover, most if not all business contracts must be based in part upon the assumption that the statutory climate in which they are negotiated will not undergo any drastic change. If it does so change, the parties may have a defense of legal impossibility to the performance of their contractual obligations, but they will rarely have any claim against the government. Such a claim based on reliance on the current statutory state of affairs is especially unlikely where, as here, the legislature has expressly reserved the right to "amend or repeal such law at any time." 26 U.S.C. § 3304(a)(17).

■ We therefore find, as a matter of law, that the unemployment insurance program does not create contract rights which are cognizable under the contract clause of the United States Constitution. Plaintiffs' claims based on the contract clause must therefore be dismissed.

### 2. *Equal Protection/Due Process*

Plaintiffs contend that the defendants are violating the equal protection clause and/or the due process clause of the United States Constitution (1) by offsetting pensions contributed to by the base period employer but not those where the base period

employer made no contribution; (2) by treating Social Security and Railroad Retirement benefits in a more restrictive manner than other pensions; (3) by offsetting some pensions but not offsetting other forms of income (*e. g.*, stock dividends); (4) by offsetting the *full* amount of a pension when a base period employer's contribution has increased the amount of the pension, but not offsetting pensions which became fully vested before the beginning of the base period, even though the base period employer may have made contributions to the pension fund; (5) by requiring a full pension offset when the base period employer contributes to a multiemployer pension plan, even when such contributions do not affect eligibility for a pension, while offsetting other pensions only when the base period employer's contributions have affected pension eligibility or amount; and (6) by requiring that pensions paid periodically be offset in each week in which a payment is received, or prorated so that there is an offset in each week, while offsetting pensions that are paid in one lump sum only in the one week in which payment is received rather than on a pro rata basis. In addition, plaintiff argues that the pension offset provision violates his right to due process because requiring pension offsets bears no rational relation to any legitimate government purpose, or because it creates an irrebuttable presumption that persons receiving pensions are no longer in the work force or are no longer in need of unemployment insurance benefits. We find that the statute as construed by defendants is not unconstitutional under either the due process or the equal protection clause of the United States Constitution.

▮ The applicable test for determining whether any of the classifications enumerated above violates the equal protection clause of the constitution is whether the classification bears a rational relationship to a legitimate state interest. *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Similarly, the test for determining whether the set-off provisions (or any irrebuttable presumptions they create) violate the due process clause is wheth-

er they are "justifiable on any conceivable rational basis." *Vlandis v. Kline*, 412 U.S. 441, 458, 93 S.Ct. 2230, 2239, 37 L.Ed.2d 63 (1973). Plaintiff appears to concede, as he must, that since no suspect classification or fundamental right is involved in any of the classifications mentioned above, this court could not properly subject any of the classifications to equal protection "strict scrutiny." He does suggest, however, that the irrebuttable presumptions created by the statute should be subjected to exacting review because they abridge plaintiff's fundamental right to work. It is by no means clear that the right to work is such a fundamental right, *see Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), but we need not reach this question because neither practically nor legally does the disputed legislation deny plaintiff the right to pursue employment.

▮ Hence, both the equal protection and the due process issues are subject to traditional "rational basis" analysis. We cannot question the wisdom or fairness of the legislature's policy judgments, but may only determine whether those judgments have any conceivable rational basis. We find that there is such a rational basis for each of the classifications which plaintiff challenges, and for the overall offset provision and any irrebuttable presumptions it creates, and, therefore, that the offset provisions pass constitutional muster.

▮ It bears repeating that our inquiry must be limited to the question whether "any state of facts either known or which could reasonably be assumed" supports the pension offset system. *U.S. v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938). Plaintiff bears the burden of negating every conceivable fact which might rationally support the legislation as the Secretary has construed it. *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1972). Several conceivable purposes for the offset provisions can easily be identified. For example, it is quite apparent that the legislature

sought to eliminate the possibility that a worker who was actually retired rather than still available for work, could collect unemployment insurance benefits. At the same time, the legislature made a broad, and perhaps imperfect, judgment that a pensioner's need for unemployment insurance benefits is less urgent than that of other claimants. The legislature quite apparently also wished to avoid forcing employers to be concurrently responsible for both unemployment insurance and pension benefits arising from the same period of employment. Yet another apparent purpose of the system is to preserve the program's fiscal integrity by tightening eligibility standards. And an overarching purpose served by the breadth of the various classifications which have been made is ease of administration. Although these classifications may not serve the legislature's primary purpose in each and every individual claimant's case, the classifications can be justified by their ease of administration. *See, Richardson v. Belcher,* 404 U.S. 78, 84, 92 S.Ct. 254, 258, 30 L.Ed.2d 231 (1971); *Vance v. Bradley,* 440 U.S. 93, 109, 99 S.Ct. 939, 948, 59 L.Ed.2d 171 (1979); *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1974). Avoidance of costly individual eligibility determinations, which would deplete the program's resources, justifies the admittedly harsh results which may befall some claimants. *See, Idaho Dept. of Employment v. Smith,* 434 U.S. 100, 101 (1977) (upholding disqualification of day but not night students from unemployment benefits). In an area of economics and social welfare such as this, a classification "does not offend the Constitution simply because it 'is not made with mathematical nicety or because in practice it results in some inequality' . . . ." *Dandridge v. Williams,* 397 U.S. 471, 485–86, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970).

Both state and federal courts have found that similar purposes formed rational bases for legislation requiring the offset of some kinds of income against certain public benefits. *See generally,* Annot., 56 ALR 3d 520, 526 (1974) (Supp.1980); see also, *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30

L.Ed.2d 231 (1971) (upholding the offset of workers' compensation but not private insurance benefits against Social Security Disability Insurance benefits.)

Since we find that considerations of administrative convenience justify all of the various classifications which plaintiff challenges, we need not discuss each of those classifications in great detail. We think it important to note however, that special considerations form rational bases for some of the challenged features of the pension offset system. This is true even of the Secretary's interpretation of the statute which, of course, is far broader than plaintiff's.

■ For example, the "base period-pension enhancement" feature, (pursuant to which pensions other than Social Security and Railroad Retirement pensions are offset only if (1) they are received from an unemployment insurance base-period employer, *and* (2) they are "enhanced" during the base period) limits the potentially double impact on employers of periods of high unemployment. Perhaps it is unwise and sometimes unfair to offset the entire pension amount even when a pension has been only minimally enhanced during the base period, but this system obviates the need for complex and costly individual calculations of benefit levels. However unequal treatment of some individual claimants may be under this plan, our limited function in this constitutional analysis is to determine whether there is any conceivable rational basis for the plan, not whether we believe it is the wisest and fairest possible system.

Plaintiffs also complain that Social Security and Railroad Retirement pensions are treated "more harshly" than other pensions because they are offset whether or not they are enhanced as a result of base period work, as long as the base period employer has "maintained or contributed to" them. This difference in treatment does not render the statute or the Secretary's interpretation of it constitutionally infirm. It can be justified on the same rationale that justifies the "pension enhancement" feature of the offset system—that is, it also prevents

employers from being concurrently responsible for benefits during one period of employment. This is because an employer must *always* contribute to the Social Security program based on each employee's earnings, while his financial responsibility for a private pension may cease under the pension plan once the pension has fully vested. Moreover, social security and private pensions are fundamentally different from one another, and this difference forms a rational basis for variations in treatment. Private pensions are negotiated by contract, are paid from private funds, and can be viewed as deferred compensation for work, while Social Security and Railroad Retirement benefits, like unemployment insurance benefits, are controlled by statutes which can be amended at any time, are paid from a public resource which is rapidly being depleted, and are more easily seen as public insurance, expressing legislative concern for the aged and needy, rather than as deferred compensation. Thus, Congress could conceivably have viewed these benefits as more truly duplicative of unemployment benefits than private pensions, and therefore decided to accord them "harsher" treatment.

▄ Plaintiff also argues that defendants' failure to prorate pensions that are "enhanced" during the base period, so that only the "enhancement" is offset, and their failure to prorate lump sum pensions so as to treat their recipients like periodic pensioners, constitutes a denial of equal protection. We must repeat that, however unfair we might believe the pension "enhancement"-total offset rule to be, we may not require Congress to draw its lines with mathematical precision, or as we ourselves might draw them. In this case, ease of administration will justify the lack of precision, and the inequities it doubtless produces. As to the proration of lump sum pensions, defendants urge that such pensions may, in fact, be prorated at the states' option. Assuming that this is not true, however, and that Congress has failed to provide for the proration of lump sum pensions, it does not constitute a denial of equal protection. Although such proration

might serve Congress's avowed and apparent purposes, "a statute is not invalid ... because it might have gone farther than it did ... [r]eform may take one step at a time, addressing itself to that phase of the problem which seems most acute to the legislative mind...." *New Orleans v. Dukes,* 427 U.S. 297, 305, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1975).

Our role in this constitutional analysis is sharply limited by separation of powers principles, which require us to uphold the legislature's policy judgments if there is any rational basis for them, and to refrain from substituting our own. Accordingly, and for the above reasons, we grant summary judgment in favor of defendants and against plaintiff as to his constitutional claims.

### 3. *UIPL Directive No. 7–81*

Finally, plaintiff challenges UIPL Directive No. 7–81, which explains to the states how they should apply the new pension offset rule. Plaintiff argues that the directive is null and void for failure to comply with the publication requirements of the Administrative Procedure Act. We agree that the directive is void for failure to publish, and therefore decline to reach the question whether the directive is inconsistent with the statute which it purports to interpret. Instead, we order the Secretary to cease enforcing UIPL Directive No. 7–81 unless and until it is published pursuant to the procedures outlined in 5 U.S.C. §§ 553(b), (c), and (d). Since publication of this or another implementing directive could conceivably moot plaintiff's claims, we stay further proceedings in this action until after such publication. *See, Kelly v. U.S. Department of Interior,* 339 F.Supp. 1095, 1102 (E.D.Cal.1972).

▄ It is fundamental that administrative regulations are void unless they are promulgated in strict compliance with the Administrative Procedure Act, 5 U.S.C. § 553. This Circuit has long insisted upon scrupulous conformity with the Act. *See, e. g., Hotch v. U.S.,* 212 F.2d 280 at 283–84, 14

Alaska 594 (9th Cir. 1954). Even seemingly technical or pro-forma publication requirements must be strictly enforced because these requirements afford an opportunity for an exchange of ideas among regulating agencies, regulated citizens, and experts in the field being regulated. During an age in which resentment against "big government" is running high, and a debate about the proper role of the federal government in social welfare programs is raging with unprecedented furor, it is especially important that agencies administering such social welfare programs avail themselves of the guidance which interested members of the public can offer.

 We disagree with the Secretary's contention that the directive is exempt from any publication requirements either because it relates solely to public benefits (553(a)(2)), or because it is merely an interpretive rule or general statement of policy (§ 553(b)(A)). Administrative rules, like this one, having a substantial impact upon private rights may not be made without notice and comment procedures, even if the rule is exempt from § 553.

 We doubt that the UIPL directive is, as the Secretary contends, an interpretive rule within the meaning of § 553(b)(A). The directive is finally determinative of the rights of thousands of unemployment insurance claimants, and of the obligations of states which wish to continue to participate in the cooperative state-federal unemployment insurance program. There is nothing "tentative" about the directive: it does not merely announce the Secretary's "tentative intentions for the future," *see, Pacific Gas and Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C.Cir.1974), but imposes an immediately "binding norm," *id.*, upon state agencies and upon thousands of unemployed workers. The agency's own characterization of its statement as a "directive" quite candidly and accurately suggests that states will face the drastic consequence of decertification if they fail to comply with its terms. *See, e. g., Alabama v. Marshall*, 626 F.2d 366 (5th Cir. 1980). Such a mandatory directive to state agencies which administer a federal program cannot be considered an interpretive rule or statement of general policy. *See, Aiken v. Obledo*, 442 F.Supp. 628, 650 (E.D.Cal.1977). Defendant argues that the directive is not mandatory on the states because a state can always choose to end its participation in the cooperative unemployment insurance program. This disingenuous argument was implicitly rejected in *Aiken v. Obledo, supra*, at 649, a case in which not only the state's participation in the overall welfare program, but also its adoption of the challenged regulations, was voluntary. In the instant case, such drastic consequences for the State of California and its residents would follow from the state's failure to comply with the UIPL Directive, that we cannot consider the state's compliance voluntary.

 However, we need not decide whether the directive is exempt from § 553 notice and comment provisions under the exception for interpretive rules and statements of general policy, because it is quite clearly exempt as a "matter relating to public property, loans, grants, benefits, or contracts." *See, Rodriguez v. Swank*, 318 F.Supp. 289 (N.D.Ill.1970), aff'd 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971) (the exemption applies to rulemaking concerning the program of aid to families with dependent children). Nevertheless, we find that the rule has such a substantial impact upon the rights of private parties that it is void unless promulgated with notice and comment procedures. *See, Aiken v. Obledo*, 442 F.Supp. 628, 649–50 (1977) (even if rule would otherwise be exempt from § 553 under the exemption for "procedural" rules, it was not exempt because it had a significant impact upon those regulated); *see, also, Thompson v. Washington*, 497 F.2d 626 (D.C.Cir.1976) (tenants in publicly supported housing entitled to notice and comment procedure with respect to rules regarding rent increases, even though literal terms of APA clearly did not apply); *Anderson v. Butz*, 550 F.2d 459 (9th Cir. 1977); *Noel v. Chapman*, 508 F.2d 1023 (2d Cir. 1975); *Texaco, Inc. v. FPC*, 412 F.2d 740 (3d

Cir. 1969); *Lewis v. Weinberger*, 415 F.Supp. 652 (D.N.M.1976); *St. Francis Mem. Hosp. v. Weinberger*, 413 F.Supp. 323 (N.D.Cal.1976); *Pharmaceutical Manufacturers Assoc. v. Finch*, 307 F.Supp. 858 (D.Del.1970); *National Motor Freight Traffic Assoc. v. U.S.*, 268 F.Supp. 90 (D.D.C. 1967), *aff'd per curiam*, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). This "substantial impact" test of whether a rule falls within an exception to § 553 represents an attempt to see that the purposes of the notice and comment rule are carried out, rather than employing "facile semantic distinctions" in order to determine whether a regulation is subject to notice and comment requirements. *See, Pharmaceutical Manufacturers Ass'n v. Finch, supra*, at 863. Courts have long recognized that the basic policy of the APA requires that, at least when a rule has substantial impact upon regulated individuals, notice and an opportunity for comment should be provided. Therefore, courts are free to make common law of administrative procedure which goes beyond the APA's minimum requirements. *See generally, Davis, Administrative Law of the Seventies*, § 6.01–8 (1976).

Surely the regulations now challenged would have a "significant impact" upon regulated individuals. Mr. Rivera's own case graphically demonstrates how the regulations will have the effect of reducing his income to the point where it is barely possible for him to meet his basic needs. There are thousands of California residents in similar straits. Whether or not the directive is in fact inconsistent with the statute which it purports to implement, "elementary fairness" requires that these significantly affected individuals, and other interested members of the public, be afforded an opportunity to comment on the question. *See, Independent Broker-Dealers Trade Ass'n v. SEC*, 442 F.2d 132, 144 (CADC 1971), *cert. den.*, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971).

■ We therefore order that the Secretary cease enforcement of UIPL Directive No. 7–81 unless and until it has complied with the procedures set forth in 5 U.S.C. § 553(b), (c) and (d), and that it notify the State of California that UIPL Directive 7–81 is void and unenforceable until further notice. Since, as noted above, it is conceivable that plaintiff's claims will become moot after this publication procedure, we stay further proceedings in this action until after the directive (or other implementing regulations) are so published.

### C. *Class Certification*

■ Plaintiffs move to have this action certified as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. Defendants do not dispute (and there could be no reasonable dispute) that the normal prerequisites to a Rule 23(b)(2) class action are satisfied. Defendants argue, however, that no useful purpose will be served by granting class certification, because plaintiffs seek declaratory and injunctive relief which, if granted, would effectively prevent defendants from enforcing the pension offset rules against all of the California residents who would be members of the class. Defendants cite numerous cases holding that, where injunctive or declaratory relief will similarly affect all members of the proposed class, class certification should be denied. Such a rule serves the salutary purpose of avoiding the expense, delay, and supervision problems which attend class actions without compromising the relief that can be accorded.

Because plaintiff seeks retroactive benefits for all members of the class, however, the cases upon which defendants rely are inapposite. In *James v. Ball*, 613 F.2d 180, 186 (9th Cir. 1979), the court denied class certification in a suit challenging the constitutionality of a state elections statute since "the relief sought will, as a practical matter, produce the same result as formal classwide relief." The same cannot be said where, as here, the plaintiff seeks ancillary monetary relief for each of the members of the class. We therefore decline to apply the emerging doctrine suggested by defendants, and order that plaintiff's motion for class certification is granted.

 We also find that the interests of the named plaintiffs are substantially identical to those of the class which they represent, and that, together with the International Union of United Automobile, Aerospace, and Agricultural Implement Workers of America, as *amicus curiae*, they have more than adequately represented the interests of the class with respect to the issues decided in the instant memorandum and order. *See, Alexander v. Aero Lodge No. 735, Intern. Assoc. of Machinists and Aerospace Workers, AFL–CIO*, 565 F.2d 1364, *cert. den.*, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1977). We are mindful that the form and timing of any notice to the class members rests in our discretion, and would consider any suggestions from the parties on this point as the action develops. However, in view of the important questions involved and the need for speedy resolution of those questions, and of the adequacy of representation afforded by the named plaintiffs, we find that the motions discussed in the instant memorandum are properly submitted and resolved prior to any notice to the class. Should it become apparent that protection of the parties' interest or the fair and expedient conduct of this action requires notice to the class members, this court will make such orders concerning notice and participation of the class members as may be appropriate.

Accordingly, IT IS ORDERED that:

1. Plaintiffs' motion for class certification is GRANTED; and that

2. The Federal defendant's motion to dismiss is DENIED; and that

3. Summary judgment and/or dismissal in favor of defendants and against plaintiffs, as to plaintiffs' constitutional claims, is GRANTED; and that

4. Summary judgment in favor of plaintiffs and against defendants, as to the validity of UIPL Directive 7–81 is GRANTED; and that

5. Further proceedings in this action are stayed until after the Secretary of Labor promulgates implementing regulations pursuant to the procedures specified in this Order.