**Michael RIVERA, on behalf of himself and all others similarly situated, Plaintiffs,**

v.

**Douglas X. PATINO, individually and in his capacity as Director of California Employment Department; Raymond Donovan, individually and in his capacity as Secretary, United States Department of Labor, Defendants.**

**No. C–80–3469 RFP.**

United States District Court, N. D. California.

May 6, 1982.

See also, D.C., 524 F.Supp. 136.

Robert Taren and James Rumble, Senior Citizens Legal Services, Santa Cruz, Cal., for plaintiffs.

Peter W. Waldmeir, Dept. of Justice, Washington, D. C., G. Christopher Stoll, Asst. U. S. Atty., Charlton G. Holland, III and Asher Rubin, Deputy Attys. Gen., San Francisco, Cal., for defendants.

Stephen P. Berzon, Altshuler & Berzon, San Francisco, Cal., John A. Fillion and Jordan Rossen, Detroit, Mich., for UAW amicus curiae.

### MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

### A. PROCEDURAL POSTURE OF THE CASE

Plaintiffs filed suit to invalidate federal and state statutes which are, in effect, identical. These statutes, 26 U.S.C. § 3304(a)(15) and Cal.Unemp.Ins.Code § 1255.3, mandate reductions in unemployment insurance benefits corresponding to the receipt by the worker of pension payments and/or social security retirement benefits. Plaintiffs also sought to invalidate a directive issued by the United States Department of Labor and a similar directive issued by the California Employment Development Department. Each of these directives interprets and enforces the appropriate contested statute.

In their First Amended Complaint, plaintiffs claimed that the statutes are unconstitutional, that the federal and state directives violate congressional intent, and that the federal directive is null and void for failure to comply with the publication requirements of the Administrative Procedure Act.

In our order of July 9, 1981, as amended on July 15, 1981, we held that the federal and corresponding state statute were not unconstitutional. *Rivera v. Patino*, 524 F.Supp. 136 (N.D.Cal.1981). However, we held that United States Department of Labor UIPL Directive 7–81, which explains to states how to apply the federal pension offset statute, is null and void for failure to comply with the publication requirements of the Administrative Procedure Act. We ordered the Secretary to cease enforcement of the directive unless and until it was published pursuant to the procedures outlined in 5 U.S.C. §§ 553(b), (c), and (d). Since it was conceivable that the remainder

of plaintiff's claims could become moot through proper publication of either UIPL Directive 7–81 or of a different implementing directive, we stayed further proceedings in this action until such publication. Thus, we did not address the question whether the voided federal directive was an unwarranted interpretation of the federal statute and was contrary to congressional intent. Neither did we address that question as to the parallel state directive.

Despite the fact that the federal directive is now void, the State of California continues to follow the state directive, because it believes that directive to be consistent with the federal and state statutes. Thus, the question whether the state directive is contrary to congressional intent has not been mooted by our imposition of the stay. Because members of the plaintiff class are currently governed by an actively implemented state directive which may be an unwarranted interpretation of the federal and state statutes, we now lift the stay as to the state defendant, and proceed to consider certain aspects of the state directive, as requested by plaintiffs.

The state directive in question, Employment Development Department Field Office Directive No. 80–223 UI (November 7, 1980), construes the state pension offset statute, Cal.Unemp.Ins.Code § 1255.3. Our task at present is limited to determining whether this state directive is consistent with the intent of the California state legislature in enacting Cal.Unemp.Ins.Code § 1255.3. However, it is clear that Cal.Unemp.Code § 1255.3, which is, in effect, identical to the federal pension offset statute, was formulated by the state legislature solely in order that the State of California might maintain certification from the United States Department of Labor—a prerequisite both to federal reimbursement of the state's cost of administering its unemployment insurance program, 42 U.S.C. § 501 *et seq.*, and to the tax credit employers receive against the federal payroll tax, 26 U.S.C. § 3301 *et seq. See generally Rivera v. Patino, supra,* 524 F.Supp. at 140–41.[1] In order to maintain certification, then, the state legislature intended Cal.Unemp.Ins.Code § 1255.3 to be construed in the same manner as the federal pension offset statute, 26 U.S.C. § 3304(a)(15). Thus, in construing the *state* statute, we must look to the proper construction of the *federal* statute. If the state directive is consistent with the intent of Congress in enacting the federal pension offset statute, it will also be consistent with the intent of the state legislature in enacting the state pension offset statute. Conversely, if the state directive is inconsistent with congressional intent in enacting the federal pension offset statute, it will also be inconsistent with the legislative intent underlying the state statute, and will

1. That the state pension offset statute was intended to be identical to the federal pension offset statute is apparent from the very language of the state statute:

(a) Except as provided by subdivision (c), the amount of unemployment compensation benefits, extended duration benefits, and federal-state extended benefits payable to an individual for any week which begins after March 31, 1980, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced, but not below zero, by an amount equal to the amount of such pension, retirement or retired pay, annuity, or other payment, which is reasonably attributable to such week.

(b) The provisions of subdivision (a) shall be operative only during such time as Section 3304 of the Federal Unemployment Tax Act requires that state unemployment insurance laws contain such provisions as a condition of certification of state unemployment insurance laws by the Secretary of Labor.

(c) The reduction of benefits specified in subdivision (a) shall be limited by the provisions of any amendment to paragraph (15) of Section 3304(a) of the Federal Unemployment Tax Act, enacted before January 1, 1981, which mandates or permits a limitation on the reduction of unemployment compensation benefits by the amount of pension, retirement or retired pay to an individual, as described in subdivision (a). This subdivision shall only apply to benefits paid after the effective date of the amendment to paragraph (15) of Section 3304(a) of the Federal Unemployment Tax Act.

Cal.Unemp.Ins.Code § 1255.3.

be subject to being struck down as contrary to the intent of the state legislature. For this reason, the federal pension offset statute, and the congressional intent underlying this statute, is the primary focus of our inquiry.

## B. BACKGROUND OF THE FEDERAL PENSION OFFSET STATUTE

In 1976, Congress, concerned that certain retirees who had no intention of returning to work were collecting unemployment insurance benefits,[2] enacted 26 U.S.C. § 3304(a)(15).[3] That provision required states participating in the cooperative federal/state unemployment insurance compensation scheme to reduce a retiree's unemployment insurance benefits, dollar for dollar, by the amount of governmental or private retirement payments the retiree was receiving. Initially scheduled to become effective on September 30, 1979, the amendment's effective date was extended to March 31, 1980, "because of concern that the [1976] provision may have been too broadly drawn," 126 Cong.Rec. S2095 (daily ed. March 4, 1980) (remarks of Senator Boren).

Congress ultimately did decide that the 1976 provision, which required that *all* recipients of retirement pay be subject to the offset, was ineffective in distinguishing those who were genuinely retired and had no intention of rejoining the work force, from those who, despite having been forced into retirement, needed to re-enter the work force in order to meet their expenses. Senator Boren explained the problem with

the 1976 amendment—and how his proposed amendment would rectify it—as follows:

[I]f a person has been working for a particular employer and he retires and starts receiving a pension from that employer, he cannot go down to the unemployment office and start drawing benefits as if he is unemployed. He is not unemployed. He is retired and he is drawing a pension from his last employer.

This would keep that provision of current law. However, it would take care of the situation which [sic] a person might have earlier in life worked for a particular employer, let us say for 20 years. He starts to draw his pension, which is not enough to live on. He takes another job and works for the second employer for, let us say, 10 years and then, because of an economic downturn, he is thrown out of work. Well, clearly, in that situation, he should not be denied the right to receive unemployment compensation because he might be drawing a pension for work which he finished doing for another employer some 10 or 15 years before. So the bill corrects that provision of the current law.

126 Cong.Rec. S2095 (daily ed. March 4, 1980) (remarks of Senator Boren).[4]

Thus, shortly after the 1976 version of section 3304(a)(15) became effective, it was amended by section 414 of the Multi-employer Pension Plan Amendments Act of 1980. Effective as of 1981, section 3304(a)(15)(A) now provides:

---

**2.** *See, e.g.,* 122 Cong.Rec. 33279–80 (1976) (remarks of Senators Long and Bartlett).

**3.** 26 U.S.C. § 3304(a)(15) states in relevant part:

[T]he amount of compensation payable to an individual for any week which begins after March 31, 1980, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced (but not below zero) by an amount equal to the amount of such pension, retirement or retired pay, annuity, or other

payment, which is reasonably attributable to such week.

**4.** Also pertinent are the following remarks by Senator Javits:

If a claimant has retired from an employer with a pension and has then taken another job, he or she has certainly demonstrated current labor market attachment and an intent to work. So application of the pension offset in these circumstances is unfair and unnecessary to prevent the abuse of the UI system by retirees that has been alleged. 126 Cong.Rec. S2101 (daily ed. March 4, 1980) (remarks of Senator Javits). *See also id.* at S2096 (remarks of Senator Dole).

§ 3304. Approval of State Laws

(a) Requirements.—The Secretary of Labor shall approve any State law submitted to him, within 30 days of such submission, which he finds provides that—

. . . . .

(15) the amount of compensation payable to an individual for any week which begins after March 31, 1980, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced (but not below zero) by an amount equal to the amount of such pension, retirement or retired pay annuity, or other payment, which is reasonably attributable to such week except that—

(A) the requirements of this paragraph shall apply to any pension, retirement or retired pay, annuity, or other similar periodic payment only if—

(i) such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer (as determined under applicable law), and

(ii) in the case of such a payment not made under the Social Security Act or the Railroad Retirement Act of 1974 (or the corresponding provisions of prior law), services performed for such employer by the individual after the beginning of the base period (or remuneration for such services) affect eligibility for, or increase the amount of, such pension, retirement or retired pay, annuity, or similar payment.

Stated more simply, sections (A)(i) and (A)(ii) specify the conditions under which unemployment benefits are to be reduced by pension payments and by social security and railroad retirement benefits. As to social security and railroad retirement benefits, (A)(i) requires offset only of benefits paid under a plan which the base period employer[5] "maintained . . . or contributed to." As to private pensions, again, (A)(i) requires offset only of payments made under a plan which the base period employer "maintained . . . or contributed to"; and (A)(ii) imposes an additional requirement that the pension increased (or the worker gained eligibility) as a result of services performed during the base period.

## C. ALLEGED INCONSISTENCIES BETWEEN THE STATE DIRECTIVE AND THE FEDERAL STATUTE

Plaintiffs argue[6] that the state directive misconstrues the pension offset statute in three ways,[7] resulting in the improper offsetting of pension payments and social security benefits against unemployment insurance benefits.

■ The first issue concerns the proper construction of 26 U.S.C. § 3304(a)(15)

---

5. In all states, the "base period"—that is, the period of employment during which eligibility for unemployment insurance benefits is accrued—is four calendar quarters.

A "base-period" employer is an employer who paid wages on which the U.I. eligibility of the claimant and the amount and duration of unemployment benefits is based. In 37 States [including California; see Cal.Unemp. Ins.Code § 1275], the "base period" is the first 4 of the last 5 completed calendar quarters prior to the filing of a U.I. claim . . . HR. 96-538, 96th Cong., 1st Sess. 5 (1979).

6. Many of plaintiffs' arguments were actually raised in the briefs of amicus curiae International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW). Plaintiffs have incorporated these arguments, by reference, into their present motion.

7. In the First Amended Complaint, plaintiffs raise two additional claims, concerning the allegedly improper treatment of periodic pension payments and lump sum pension payments under the state directive. Plaintiffs have not asked us to reach these claims in the present motion to lift the stay against the state defendant. Consequently, it is unnecessary to reach these questions at the present time.

(A)(ii).[8] Plaintiffs contend that (A)(ii) should be interpreted as requiring that only the amount by which private pension benefits *increased during the base period* should be offset against unemployment insurance benefits. Instead, the state directive interprets (A)(ii) as requiring that, once the conditions of (A)(i) and (A)(ii) are met, private pensions must be offset in their entirety.[9] Defendant argues that the state directive correctly construes (A)(ii). For the reasons given below, we agree with defendant. Section (A)(ii) does not limit the offset of private pension payments to the increase in those payments attributable to the base period.

The second issue concerns the proper offset of social security benefits. The question is whether social security benefits attributable to services performed for a *nonbase period employer* may be offset against unemployment insurance benefits.[10] Plaintiffs contend that if a worker employed by Company A leaves the company after having worked a sufficient number of quarters to become eligible for social security bene-

fits and then obtains employment with Company B, and is ultimately laid off by Company B, the social security benefits attributable to work performed for Company A should not be offset against the unemployment insurance benefits attributable to work performed for Company B. The state directive requires that, under those circumstances, the social security benefits be offset.[11] Defendant argues that the directive correctly construes the federal statute in this regard. We find for plaintiffs on this issue.

◼ The third issue concerns pensions which vested prior to April 1, 1980, the effective date of 26 U.S.C. § 3304(a)(15). Plaintiffs contend that these pensions should not be offset against unemployment insurance benefits. The state directive does not make any exception for them, and so requires that they be offset in the same manner as pensions which vest subsequent to the effective date of the statute. Defendant supports the state directive in this respect. We are in agreement with defend-

---

8. As we noted above, our discussion will focus primarily upon the federal pension offset statute, with the understanding that the proper construction of the federal statute *is* the proper construction of the parallel state pension offset statute.

9. The Suggested Sample Statements in Attachment 4 of Employment Development Department Field Office Directive No. 80–223 UI (November 7, 1980) make it clear that the Employment Development Department does require an offset of the entire amount of a pension payment once the conditions of 26 U.S.C. § 3304(a)(15)(A)(i) and (A)(ii) have been met. One such sample statement is the following:
 B. WBA REDUCED—NO CLAIMANT CONTRIBUTION TO PENSION (For pensions other than Social Security or Railroad Retirement)
 You are receiving pension payments which are based on your prior work, from a plan maintained by, or contributed to by, a base period employer. Evidence indicates that services performed after the beginning of the base period of your claim either affected your eligibility to receive the pension or increased the amount of your pension. Evidence also indicates that you did not contribute to the fund from which your pension is paid. Consequently, *the total amount of your pension payments is considered deductible income*

under *Section 1255.3 of the Unemployment Insurance Code.* Therefore, your unemployment insurance weekly benefit amount must be reduced by your pension payments of (1) $_____, as computed on a weekly basis. (Emphasis added.)

10. In the First Amended Complaint, plaintiffs also address that question as it applies to private multi-employer pension funds. Like the questions of the proper treatment of periodic and lump sum payments, *see* footnote 7, *supra,* the multi-employer pension fund issue has not been raised in the present motion to lift the stay against the state defendant. Consequently, we do not address it at this time.

11. The state directive provides, in relevant part:
 Where an individual works during his/her base period for an employer who contributes to a multi-employer pension fund (e.g., Social Security, union pension fund, etc.), and the individual then receives a pension from that multi-employer pension fund, the entire pension can be part of the pension offset (not just that portion attributable to a given employer).
 Employment Development Department Field Office Directive No. 80-223 UI, 2 (November 7, 1980).

ant's view that even pensions which vested prior to April 1, 1980 are subject to offset.

### 1. The Proper Measure of the Offset Under (A)(ii)

As noted above, plaintiffs contend that where an offset of a private pension is mandated by the federal statute, (A)(ii) provides that only the amount of the increase in pension benefits attributable to services performed during the base period should be offset against unemployment insurance benefits.[12] We reject that contention for the reasons stated below. If an offset of a private pension is mandated by the statute as a whole, then (A)(ii) does not limit the size of the offset.

a. *Plain meaning of (A)(ii).* Section 3304(a)(15) states that unemployment insurance benefits are to be offset by an amount equal to "periodic payment[s] ... based on ... previous work"—that is, periodic retirement payments. Sections (A)(i) and (A)(ii) add two conditions which must be satisfied before an offset of a private pension payment against unemployment insurance benefits may occur. The first condition is stated by (A)(i), which provides that such an offset can only occur when the pension payment is made "under a plan maintained (or contributed to) by a base period employer." The second condition, stated by (A)(ii), provides that such an offset can only occur when services performed for the base period employer during the base period "affect eligibility for, or increase the amount of, such pension." If both conditions are fulfilled, the pension payments are offset against the unemployment insurance benefits. The language of (A)(ii) thus appears merely to state one of two conditions which must be satisfied before the offset of pension payments must occur. The language does not suggest that, as plaintiffs contend, (A)(ii) alters the *amount* of the offset.

However, this finding does not necessarily end our inquiry. The Ninth Circuit's position on the significance of the plain meaning of a statute has been most recently stated in *Heppner v. Alyeska Pipeline Service Co.*, 665 F.2d 868 (9th Cir. 1981):

> When the meaning of statutory language is unclear, one must look to the legislative history. When the statutory language is clear, and there is no reason to believe that it conflicts with the congressional purpose, then legislative history need not be delved into, unless it is brought to the court's attention that there is within the legislative history something so probative of the intent of Congress as to require a reevaluation of the meaning of the statutory language.

*Id.* at 871 (footnote omitted).

The Ninth Circuit has also noted that "[r]esort to legislative history is not inappropriate where application of the 'plain meaning' rule would lead to an unreasonable result 'plainly at variance with the policy of the legislation as a whole.'" *Gila River Indian Community v. Henningson, Durham & Richardson*, 626 F.2d 708, 710 (9th Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981). Plaintiffs suggest that there is reason to believe that the plain meaning of (A)(ii) conflicts with congressional intent, and would lead to an unreasonable result. Thus, before resorting to legislative history, we first examine plaintiffs' argument that the offsetting of the entire amount of a pension that meets the conditions set forth in (A)(i) and (A)(ii) would lead to an unreasonable result contrary to the policy of the federal pension offset legislation as a whole.

Plaintiffs argue that, in enacting section 3304(a)(15), Congress was primarily concerned with eliminating the "double-dip"—that is, with preventing a worker from receiving two forms of compensation as a result of work performed during the same period. The 1976 provision required that *all* retirement payments be offset against unemployment insurance benefits. This was a crude method of preventing double-dipping,

---

**12.** It should be noted that, as (A)(ii) is applicable only to private pensions, plaintiffs' first issue relates only to such pensions.

because retirement benefits would be offset even if they were attributable to services performed before the worker's most recent employment. Thus, a worker who retired from Company A and began receiving retirement benefits, then worked for Company B, was laid off, and began receiving unemployment insurance benefits, would be required to offset the retirement benefits from Company A against the unemployment insurance benefits from Company B.

The overly broad 1976 provision was amended to specify the conditions in which offset is appropriate. Section (A)(i) specified that retirement benefits would be offset only if the base period employer had maintained or contributed to the retirement plan. Plaintiffs argue that the addition of (A)(i) by the Senate was a corrective measure designed to correlate more closely the offsetting of pension benefits with the base period, and so to ensure that the worker did not receive two forms of compensation as a result of work performed during that period.

Plaintiffs go on to argue that, standing alone, even the method established by (A)(i) was inexact, because it focused only on whether the retirement payments were generally *maintained by the base period employer,* and not on whether the retirement payments received from the base period employer *resulted from the base period employment.* Thus, plaintiffs argue that the House added (A)(ii) in order to ensure that an offset would occur only if pension payments were actually attributable to services performed during the base period, and thus to correlate the offset of pension payments still more accurately with the base period.[13]

Finally, and most importantly for purposes of the present discussion, plaintiffs argue that Congress intended to take a final step in accurately correlating the offset of pension payments with the base period. Plaintiffs contend that Congress intended to offset only the amount of the pension actually attributable to services performed during the base period, since only that portion of the pension results from work which actually establishes eligibility for unemployment insurance benefits. Because, plaintiffs argue, Congress enacted (A)(ii) as a means of ensuring that offsets of pension payments were accurately correlated with the base period, Congress must not have intended for fractions of pension payments *unrelated* to services performed during the base period to be offset against unemployment insurance benefits that *were* related to services performed during that period. Defendant, of course, disagrees. Its position is that where the conditions of (A)(i) and (A)(ii) have been met, the *entire* pension payment should be offset; not just the portion of the payment attributable to work performed during the base period.

In short, in suggesting that Congress intended to limit the amount of the offset to that fraction of the pension payment attributable to work performed during the base period, plaintiffs argue that the primary policy consideration resulting in the enactment of (A)(i) and (A)(ii) was an ameliorative one and that the plain meaning of (A)(ii) would defeat that purpose. Indeed, plaintiffs have called our attention to several passages within the legislative history indicating that, in enacting that section, Congress wished to mitigate the harshness of the 1976 amendment, which had refused unemployment insurance benefits to many persons who were technically retirees, and yet who had been forced to re-enter the work force only to be laid off. *See, e.g.,* 126 Cong.Rec. S2095 & 2104 (daily ed. March 4, 1980) (remarks of Senator Boren); *id.* at S12900–01 (daily ed. September 18, 1980) (remarks of Senator Bradley). In light of these passages within the legislative history which suggest that the plain meaning of (A)(ii) is at variance with the policy behind the enactment, we are justified in resorting to a more detailed scrutiny of the legislative history.

---

**13.** As will be demonstrated below, defendant essentially concurs with plaintiffs up to this point.

Before proceeding to that analysis, however, it may be useful at this stage to set forth defendant's interpretation of the purpose of (A)(ii).

Defendant's construction of (A)(i) and (A)(ii) is somewhat in accord with plaintiffs', up *to* a point, although defendant focuses on the employer rather than the employee. Defendant asserts that Congress intended to ensure that employers would not have to *pay* for both pensions and unemployment insurance benefits where both were attributable to work performed during the same period. A base period employer must make contributions to the state unemployment insurance fund when a worker who performed services for that employer during the base period collects unemployment benefits. A base period employer may also be contributing to that worker's pension during the base period. Therefore, there is a possibility that an employer, absent any offset provision, may be funding unemployment insurance benefits and pension payments attributable to the same work. This view of the problem is, of course, a mirror image of the view taken by plaintiffs. Each view takes as its premise that Congress was concerned with preventing the payment of both pensions and unemployment insurance benefits attributable to the same period in which the worker performed services. Just as the total amount the worker received is reduced through an offset of pension payments against unemployment insurance benefits, so the employer's contribution is reduced by the amount of the offset.

The historical analysis suggested by plaintiffs is consistent with defendant's view as well. The 1976 statutory provision eliminated duplicative payments by employers. However, it did so in a crude manner, offsetting all retirement payments against unemployment insurance benefits, regardless of whether the base period employer

contributed to the retirement payments. Section (A)(i) altered the 1976 provision to require offset only where a pension was maintained by a base period employer. This offset was to occur even though the employer might not have contributed to the pension *during* the base period. Thus, although (A)(i) rendered the correlation between employer contributions into pension plans and into the unemployment insurance fund somewhat more exact, the correlation was still imperfect. For example, if (A)(i) stood alone, offset would occur even where, by the time the base period began, the employer had ceased contributing to the pension plan because contributions to the pension before the onset of the base period had caused the payments to reach the maximum allowable under the plan. Defendant asserts that the House added (A)(ii) to correct this possible result of (A)(i). With the addition of (A)(ii), if a pension has reached its maximum before the base period and the employer thus does not contribute to the pension during the base period, there is no offset, since the employer is not subject to duplicative financial liability as a consequence of the base period employment.[14] An offset in such a context would give the base period employer an uncontemplated financial exemption, and so is disallowed.

Defendant, then, agrees with plaintiffs that Congress intended accurately to determine when a duplicative payment was made, by correlating pension payments during the base period with payment of unemployment insurance benefits during the same period. However, defendant asserts that Congress intended to prevent duplicative payments by offsetting the worker's entire pension, rather than by offsetting only those fractions of the pension attributable to services performed during the base period. Defendant suggests three possible policies behind section 3304 which would account for this construction of (A)(ii).

14. This explains why social security benefits are excluded from the "pension enhancement" limitation of (A)(ii). While private pension plans require employer contributions only until a certain level of funding has been reached, social security benefits are funded by a tax that

must be paid on a continuous basis. Accordingly, an employer will always pay social security taxes during the base period. Thus, enhancement would constitute an unnecessary condition for offsetting social security benefits.

First, defendant argues that Congress was concerned with administrative convenience, as it would be difficult to determine which portion of a pension payment was attributable to services performed during the base period. Second, defendant suggests that Congress was concerned with maintaining the fiscal integrity of the unemployment compensation program. Third, defendant contends that Congress intended pension payments which had increased during the base period to be offset in their entirety because even a small fractional increase in a pension payout renders the employer liable for a far greater additional payment *into* the pension fund. Thus, defendant argues, the full offset was intended to provide substantial practical relief to employers subject to duplicative payments.

b. *Legislative history.* The legislative history of (A)(ii) makes it clear that Congress intended the provision to be construed in the manner suggested by defendant.

The joint conference committee report was adopted by the Senate on September 18, 1980. Senator Bradley delivered the last speech from the floor before the conference report was approved. He offered four examples explaining the operation of (A)(i) and (A)(ii). His second example supports defendant's construction of the statute.

A worker at company A retires at age 65 after 35 years of service there and begins collecting a pension of $600 per month. He then unsuccessfully seeks new employment and files an unemployment insurance claim. The State computes this individual's unemployment benefit rate at $130 per week, or $520 per month, because of the past earnings reported to the State. This individual would not be eligible for unemployment insurance payments because the amount of the pension received from the base period employer exceeded the unemployment insurance payments that were to be paid.

126 Cong.Rec. S12901 (daily ed. September 18, 1980) (remarks of Senator Bradley).

In the Bradley example, the entire amount of the pension is offset against the unemployment insurance benefits. No attempt is made to ascertain what fraction of the pension is attributable to the base period, and to reduce the unemployment insurance benefits by only that amount. Thus, in order for plaintiffs' construction to be in conformity with Senator Bradley's example, it would have to be assumed that the entire pension of $600 per month is attributable to services performed during the base period. Yet the example states that the worker had been employed by the base period employer for 35 years. It is unlikely that the final year of employment alone could account for such a large pension. Consequently, the pension must represent retirement benefits accrued throughout the worker's history with the company. The fact that Senator Bradley stated that the $600 should be offset in its entirety against the unemployment insurance benefits indicates that he did not intend the amount of the offset to be limited to the amount of the pension attributable to the base period. His example is thus inconsistent with plaintiffs' construction of (A)(ii).

Moreover, throughout the legislative history of (A)(i) and (A)(ii), there are indicators that Congress was only defining the conditions under which the offset should occur; and that, once those conditions had been met, the offset should be of the same character as under the then-governing 1976 law. That is, the entire pension should be offset, dollar for dollar, against the unemployment insurance benefits. For example, the report of the conference committee which produced the final version of the statute states:

The House amendment to the Senate amendment to the bill provides that *the pension offset requirement of existing unemployment law* would only apply to a pension which is paid under a plan maintained or contributed to by a base period employer and which is increased by reason of services performed after the beginning of the base period.

126 Cong.Rec. H9101 (daily ed. September 18, 1980) (Joint Explanatory Statement of

the Committee of Conference) (emphasis added), reprinted at 4 Cong. & Admin.News 2918, 3066–67 (1980). The language of the conference report makes it clear that the conference committee members intended that, once the offset was deemed applicable, it would be offset as under then-existing law.

Similarly, the language of the participants in the debates indicates that a full offset was contemplated by all. See, for example, the remarks by Senator Williams shortly before the Senate agreed to the conference report:

> Except in the case of retirement benefits received under the Social Security Act or the Railroad Retirement Act, the pension offset would not apply when post-retirement income did not effect either eligibility for or the amount of the pension maintained or contributed to by a base-period of [sic] chargeable employer.

126 Cong.Rec. S12900 (daily ed. September 18, 1980) (remarks of Senator Williams). Senator Williams' comment is typical, in that the members of Congress consistently referred to "*the* offset," either without defining the term or by defining it with reference to the 1976 provision. The construction suggested by plaintiff would be a dramatic departure from the 1976 pension offset procedure, which provided for a dollar-for-dollar offset of the entire pension. If Congress had contemplated such a departure, someone surely would have said so.

Furthermore, it is not clear that a full offset of pensions is inconsistent with Congress's intent to ameliorate the harsh effects of the 1976 enactment. The punitive aspect of the 1976 statute which Congress sought to alleviate by enacting (A)(i) and (A)(ii) was the fact that, under the 1976 law, unemployment insurance benefits were reduced, dollar for dollar, by *any* retirement payment, even when the recipient of the payment, although technically "retired" from a job with Company A, had in fact been forced to seek reemployment with Company B, and had then been laid off. Sections (A)(i) and (A)(ii) were designed to ensure that such individuals, who had never intended to leave the work force and were still actively seeking employment, would not be penalized for the receipt of retirement payments from Company A. The 1980 amendments do prevent that punitive result. As such, they fulfill the only ameliorative purpose Congress expressly intended. We can find nothing to indicate that Congress intended further to ameliorate the effect of the 1976 provision by reducing the *amount* of the offset of private pensions.

Plaintiffs do point to one piece of legislative history in support of their construction. However, even that is inconclusive. During the House debate over the 1980 amendments, Representative Weiss stated that the purpose of (A)(ii) was to "clarif[y] ... a Senate-passed amendment that aids older workers." 126 Cong.Rec. H7905 (daily ed. August 26, 1980) (remarks of Rep. Weiss). That Senate amendment was (A)(i). Plaintiffs argue that (A)(ii)'s "clarification" must have changed (A)(i) so as to allow only the offset of the increase of pension payments attributable to services performed during the base period. However, it is not at all evident that the clarification was meant to have that effect. As discussed earlier, plaintiffs' construction depends on two propositions. First, that Congress intended to establish a correlation between the offset of pension payments and the base period, so that an offset would occur only if the worker received pension payments attributable to services performed during the base period. Second, that Congress intended to make this correlation "exact" by offsetting only those *portions* of the pension payments attributable to services performed during the base period. Both parties appear to agree that the first proposition is correct. The remarks of Representative Weiss seem directed toward that proposition, in that, while (A)(i), standing alone, would have permitted the offset of benefits attributable to services performed *before* the base period, (A)(ii) only permits offset where the benefits are attributable to services performed *during* the base period. Thus, it seems clear that (A)(ii) "clarified" (A)(i) by more closely correlating the offset of pension benefits with the base period. How-

ever, there is no indication that the clarification referred to by Representative Weiss required that only the increase of the pension payments attributable to the base period be offset against unemployment insurance benefits.

■ In sum, the plain meaning of (A)(i) and (A)(ii) is that only if two conditions are met can private pensions be offset: first, the pension plan is maintained by the base period employer; and second, the pension payments are enhanced as a result of services performed during the base period. The provisions do not suggest that the *amount* of the offset is to be limited to the amount by which the pension was enhanced during the base period. Apparently the showing of pension enhancement is merely required in order to ensure that the worker is truly receiving duplicative payments and that the base period employer is truly subject to duplicative financial liability for unemployment insurance benefits and pension contributions. The legislative history, insofar as it touches upon this question at all, supports the view that Congress intended the amount of the offset—once the offset is triggered—to be the same as under the previous, 1976 provision. That is, the entire amount of the pension should be offset, dollar for dollar, against the unemployment insurance benefits. This is the construction which the state defendant has given to (A)(ii). We find that the state directive is not, in this respect, inconsistent with the federal statute, and thus is not inconsistent with the intent of the state legislature in enacting the parallel state statute. Accordingly, summary judgment is granted for the defendant, and denied for the plaintiffs, on this issue.

*2. The Proper Offsetting of Social Security Benefits Under (A)(i)*

The parties offer differing constructions of (A)(i) as it applies to the offset of social security benefits. (A)(i), again, states:

> (A) the requirements of this paragraph shall apply to any pension, retirement or retired pay, annuity, or other similar periodic payment only if—
>
> > (i) such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer (as determined under applicable law) . . .

The state directive, which defendant supports, construes (A)(i) as requiring that when a worker receiving social security benefits as a result of employment with Company A re-enters the work force to perform services for Company B and is then laid off by Company B, the worker's social security benefits must be offset in their entirety against any unemployment insurance benefits resulting from the layoff. Plaintiffs contend that this construction of (A)(i) is inconsistent with the intent behind the provision, which was to require the offset of only those retirement benefits to which the base period employer (Company B in our example) contributed, and not to offset benefits to which a previous, nonbase period employer contributed.

Plaintiffs are correct in their general statement of the intent underlying (A)(i), as examples given in the legislative history clearly demonstrate. One such example concerned a proposed amendment, reported out of the Senate Finance Committee, which was virtually identical to the final version of (A)(i).[15] As noted earlier in this opinion, Senator Boren discussed the difference between the original 1976 provision and the Finance Committee amendment as follows:

> [I]f a person has been working for a particular employer and he retires and starts receiving a pension from that employer, he cannot go down to the unemployment office and start drawing benefits as if he is unemployed. He is not

---

**15.** The Senate Finance Committee amendment provided, in relevant part:

> (A) the requirements of this paragraph shall only apply in the case of a pension, retirement or retired pay, annuity, or other

similar periodic payment under a plan maintained (or contributed to) by a base period or chargeable employer (as determined under the State law) . . .

126 Cong.Rec. S2092 (daily ed. March 4, 1980).

unemployed. He is retired and he is drawing a pension from his last employer.

This would keep that provision of current law. However, it would take care of the situation which [sic] a person might have earlier in life worked for a particular employer, let us say for 20 years. He starts to draw his pension, which is not enough to live on. He takes another job and works for the second employer for, let us say, 10 years and then, because of an economic downturn, he is thrown out of work. Well, clearly, in that situation, he should not be denied the right to receive unemployment compensation because he might be drawing a pension for work which he finished doing for another employer some 10 or 15 years before. So the bill corrects that provision of the current law.

126 Cong.Rec. S2095 (daily ed. March 4, 1980) (remarks of Senator Boren). This example is in accord with plaintiff's argument that, through (A)(i), Congress intended to ensure that workers would no longer lose unemployment insurance benefits because of the receipt of a pension earned through service for an earlier, nonbase period employer.

Senator Boren's view of the Finance Committee amendment was shared by Senator Dole. In discussing the proposed amendment, he, like Senator Boren, contrasted the amendment to the 1976 provision:

> The offset provision was too broadly drafted in the original legislation and would penalize many legitimately unemployed individuals simply because they had earned pension benefits from a previous employer. Under the bill, only that portion of a pension contributed by the employer to whom the unemployment is attributable is required to be offset. This should assure that individuals who are actually unemployed rather than retired will not be penalized while conversely assuring that individuals who are, in fact, retired are not drawing unemployment benefits.

*Id.* at S2096 (remarks of Senator Dole). Again, these remarks make clear the congressional intent that benefits attributable to nonbase period employers not be offset. *See also* Senator Bradley's third example, 126 Cong.Rec. S12901 (daily ed. September 18, 1980) (remarks of Senator Bradley).

The preceding examples are addressed to the question of the proper offsetting of *private* pensions. A third example makes it clear that Congress also intended that *social security* benefits attributable to nonbase period employers be exempt from offset. That example was given in the discussion of the version of (A)(i) which was approved by the conference committee and was ultimately enacted. This final version of (A)(i) had been co-authored by Senators Chafee and Bradley. *See 126 Cong.Rec.* S12901 (daily ed. September 18, 1980) (remarks of Senator Bradley). As noted above, Senator Bradley delivered the last speech from the floor, just prior to the Senate adoption of the conference report. He gave four examples of how (A)(i) would operate. His first example is relevant to the question whether it is proper to offset social security benefits attributable to a nonbase period employer.

> [A]n individual at company A retires and begins to collect social security. For whatever reason, this person then goes to work for company B and, after 6 months there, is terminated. Assuming the individual is eligible for unemployment insurance because of the work done at company B, the level of unemployment insurance compensation will not be reduced at all. This is because the base period employer is not the same as the social security employer. The offset would apply, however, if the individual had returned to work for company A instead of working for company B. Under those circumstances, the base period employer and the social security employer would be the same.

*Id.* This example clearly demonstrates that social security benefits attributable to a nonbase period employer are not to be offset against unemployment compensation

arising from employment with a base period employer.[16]

Defendant, however, urges a different interpretation of the Bradley example. Defendant maintains that base period employer Company B must not have been paying social security taxes at all. It must have been paying into the unemployment insurance fund only. If it *had* been contributing to social security, defendant contends, the offset certainly would have occurred in the example, because the base period employer would have been making duplicative payments. This interpretation of the example, however, assumes a great deal when it assumes that Senator Bradley's Company B was exempt from paying social security taxes for its employees. Most employers are required to pay such taxes. In the absence of any suggestion to the contrary in Senator Bradley's example, we assume that the Senator was referring to a company which does pay social security taxes. Thus, in his example, Senator Bradley did mean that, even where the base period employer pays social security taxes, no offset of the worker's social security benefits should occur.

 From the start of the legislative process, then, the intent of the Senate was clear. A provision virtually identical to (A)(i) was interpreted as not requiring the offset of retirement benefits attributable to contributions by a nonbase period employer. The version of (A)(i) which prevailed in the joint conference committee was the Senate version.[17] Senator Bradley was the last to discuss the operation of (A)(i) before the conference report was approved. He set forth a specific example of the operation of the amendment which indicates that Congress made a decision not to offset social security benefits against unemployment insurance compensation where the base period employer is a different employer from the one which employed the individual during the period in which he or she achieved fully insured status.[18] Accordingly, we hold

**16.** Indeed, Senator Bradley's example goes even farther. It indicates that, in the context of the example, *no* amount of the social security benefits is to be offset, not even the amount, if any, attributable to base period employer Company B. Technically, of course, because the worker in Senator Bradley's example is receiving unemployment insurance compensation and some small fraction of social security benefits attributable to the same period of employment, an offset of that portion of the social security benefits which represents a duplicative payment would be appropriate. (See our discussion, *supra*, of the proper interpretation of 26 U.S.C. § 3304(a)(15)(A)(ii).) However, calculating the amount of the worker's social security benefits attributable to the work performed for the base period employer would be an exceedingly complex and difficult task. Social security benefits are computed by averaging wages earned during a number of the worker's highest wage earning years. While a worker achieves insured status after having accumulated a specified number of quarters of coverage, the amount of benefits payable to a fully insured worker may increase by a small amount if the worker earns a high salary in later years. Thus, in Senator Bradley's example, the worker's social security benefits may have increased slightly as a result of work performed for base period employer Company B. However, it seems clear from Senator Bradley's example that, because of the administrative difficulty of computing the amount of so-

cial security benefits attributable to the base period employer in the example, Congress did not intend this *de minimis* amount to be offset against the worker's unemployment insurance compensation. Since, as our discussion in the text indicates, Congress also did not intend the offset of social security benefits attributable to *non*-base period employers, it follows that Congress intended *no* amount of the worker's social security benefits to be offset against unemployment insurance compensation in the circumstances illustrated by Senator Bradley's example.

**17.** The conference report departed from the Senate's proposed amendment only in one respect: the inclusion of (A)(ii), a House amendment. *See* 126 Cong.Rec. H9101 (daily ed. September 18, 1980) (Joint Explanatory Statement of the Committee of Conference), reprinted at 4 U.S.Cong. & Admin.News 3066–67 (1980); 126 Cong.Rec. S12900 (daily ed. September 18, 1980) (remarks of Senator Williams).

**18.** Of course, where the worker retires from Company A, collects social security benefits, resumes working for *Company A*, and then is laid off and attempts to collect social security benefits, the offset *will* occur. This is because "[u]nder those circumstances, the base period employer and the Social Security employer would be the same." 126 Cong.Rec. S12901 (daily ed. September 18, 1980) (remarks of Senator Bradley).

that the state directive is contrary to the congressional intent underlying (A)(i) in that it requires the offset of social security benefits in the context of a worker who, following the vesting of social security benefits as a result of work performed for one company, goes to work for a different company and then becomes eligible for unemployment insurance benefits. Under those circumstances, no offset of social security benefits should occur. Since the state directive is inconsistent with the federal statute in this respect, it also contravenes the intent of the state legislature in enacting Cal.Unemp.Ins.Code § 1255.3. Thus, plaintiffs' motion for summary judgment on this point is granted against the state defendant. Defendant's cross motion is denied.

3. *The Offsetting of Pensions Which Vested Prior to the Effective Date of 26 U.S.C. § 3304(a)(15)*

The state directive provides that unemployment insurance benefits must be reduced by the offsetting of even those pensions which vested prior to the effective date of 26 U.S.C. § 3304(a)(15), April 1, 1980. Plaintiffs contend that this interpretation of the statute is unwarranted because it deprives workers of vested rights in contravention of the spirit of the nonforfeiture provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1053(a). It may well be impermissible to *reduce pension payments* by the amount of unemployment insurance benefits received. *See Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 521, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981). However, as we made clear in our order of July 9, 1981, vested pension rights are not impaired by the state's interpretation of the pension offset statute. The worker always receives the full amount of the pension to which he or she is entitled. The offset only acts to *reduce unemployment insurance benefits* by the amount of pension payments—not vice versa. As we noted in our earlier opinion, "We assume that this [reduction in income] . . . will seem equally unfortunate to the unemployment insurance claimant as it would if his pension and

not his unemployment insurance were reduced. It is inescapable, however, that the rights and duties created by plaintiffs' pension contracts are not affected by the statute." *Rivera v. Patino, supra,* 524 F.Supp. at 144. Similarly, they are not affected by the state directive.

Plaintiffs suggest that the decision of the Supreme Judicial Court of Maine in *Mailman v. Colonial Acres Nursing Home,* 420 A.2d 217 (Me.1980), provides authority for this court to refuse to construe the statute "retroactively" to affect pensions that have vested. That case does not provide such authority. There, a worker suffered an accident and became eligible for worker's compensation from May 1, 1976, until November 28, 1976. The worker was also found eligible for worker's compensation for a period beginning on October 1, 1978, and for unemployment compensation for the period from October, 1978, through April, 1979. Her employer and its insurance carrier appealed from the Worker's Compensation Committee's award of the worker's compensation benefits. In September, 1979, a state law had become effective which required the reduction of worker's compensation benefits by the amount of any unemployment compensation received by the worker during the period of the award. Appellants claimed that the court should apply that statute retroactively to their case, which was pending on the effective date of the offset statute. This would have resulted in some reduction of the worker's compensation award. The court held for the worker that the new state law was not to be applied retroactively to reduce worker's compensation benefits awarded prior to the effective date of the statute. That case is distinguishable from the present one. The state pension offset directive does not require the reduction of any benefits awarded prior to the effective date of the federal statute. It only requires that unemployment insurance benefits awarded *subsequent* to the effective date of the statute be reduced, where appropriate.

We also note that there is no support in the legislative history for plaintiff's conten-

tion that the statute does not apply to pensions which vested prior to the effective date of the statute. Indeed, such a limitation would drastically reduce the impact of the federal statute in a manner which Congress does not appear to have intended. It seems clear that the original 1976 provision was designed to prevent abuses of the unemployment compensation program by some retirees, and so maintain the fiscal integrity of the program. *See, e.g.*, 122 Cong.Rec. 33280–81 (1976) (remarks of Senator Bartlett). Congress was plainly concerned with *immediately* reducing the amount of unemployment benefits paid to those recipients who were receiving duplicative retirement payments. And yet, plaintiffs' construction of the statute would mean that it might be many years before the statute had full effect. Pensions often vest well before a worker reaches retirement age. Thus, were plaintiffs' construction accepted, for many years to come, numerous pensions would be exempt from offset simply because they had vested long before the effective date of the statute, as well as before the worker's retirement. Given the urgency with which Congress sought to implement the pension offset provisions, we doubt that such a delay was intended.

Thus, we find that the state directive, in providing that unemployment insurance benefits must be reduced even by those pensions which vested prior to the effective date of the federal pension offset statute, is not inconsistent with the federal statute. As such, it is also not inconsistent with the state statute. Summary judgment is granted as to defendant, and denied as to plaintiffs, on this point.

## D. SUMMARY

In conclusion, we hereby grant summary judgment in favor of defendant on the following two issues:

The state directive does not contravene the intent of the state legislature by requiring the offset of the full amount of pension payments against unemployment insurance benefits where the conditions of both 26 U.S.C. § 3304(a)(15)(A)(i) and (ii) are met.

The state directive does not contravene the intent of the state legislature by requiring the offset of even those pension payments attributable to pensions which vested prior to the effective date of the federal pension offset provision on April 1, 1980.

We hereby grant summary judgment in favor of plaintiffs on the following issue:

The state directive contravenes the congressional intent underlying 26 U.S.C. § 3304(a)(15)(A)(i), by requiring the offset of social security benefits in the context where a worker who leaves a company after having worked a sufficient number of quarters to become eligible for social security benefits goes to work for a different company, and then becomes eligible for unemployment insurance benefits as a result of services performed for the second employer. No amount of the social security benefits received by the worker is to be offset against the unemployment insurance benefits under these circumstances. Since the state directive requires such offsets, it contravenes the intent of the state legislature in enacting Cal.Unemp.Ins.Code § 1255.3. Accordingly, that portion of the state directive which requires such an offset is hereby declared to be null and void. State defendant is permanently enjoined from enforcing Employment Development Department Field Office Directive 80–223 UI (November 7, 1980) insofar as it requires the offset of social security benefits in the context where a worker who, following the vesting of social security benefits as a result of services performed for one company, goes to work for a different company, then becomes eligible for unemployment insurance benefits as a result of services performed for the second employer. State defendant is hereby ordered to restore to plaintiff class members any unemployment insurance benefits that would have been paid but for the implementation of the portion of state directive 80–223 which we have found to be inconsistent with the intent of the state legislature.

SO ORDERED.